## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No: 18-02673-hb |
| | ) | Chapter 7 |
| Samuel Nimrod Smith | ) | |
| aka Sam N Smith | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTICE OF MOTION SEEKING
## 11 U.S.C. §362(D) RELIEF

**TO:   DEBTOR, TRUSTEE (if applicable), AND THOSE NAMED IN THE ATTACHED MOTION:**

**PLEASE TAKE NOTICE THAT ON** July 26, 2018, at 11:00 A.M., at the U.S. Bankruptcy Court, Donald Stuart Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, South Carolina, a hearing will be held on the attached Motion.

Within fourteen (14) days after service of the attached Motion, and the Notice of Motion, accompanied by the Movant's Certification of Facts, and a blank Certification of Facts form, any party objecting to the relief sought shall:

1.  File with the Clerk of this Court a written objection to the §362 Motion;
2.  File with the Clerk of this Court a Certification of Facts;
3.  Serve on the Movant items 1 and 2 above at the address shown below; and
4.  File a certificate of such service with the Clerk of this Court.

Should you fail to comply with this procedure, you may be denied the opportunity to appear and be heard on this proceeding before the Court.

| | |
|---|---|
| DATE OF ISSUANCE: | June 29, 2018 |
| MOVANT: | Specialized Loan Servicing LLC |
| ATTORNEY: | Lawrence W. Johnson, Jr. DCID No. 2200 |
| ADDRESS: | JOHNSON LAW FIRM, P.A.<br>Post Office Box 883<br>Columbia, South Carolina  29202<br>(803) 771-1500<br>Jlfpa@bellsouth.net |

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |  |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No: 18-02673-hb |
|  | ) | Chapter 7 |
| Samuel Nimrod Smith | ) | |
| aka Sam N Smith | ) | |
|  | ) | |
| Debtor. | ) | |
|  | ) | |

## MOTION ON BEHALF OF SPECIALIZED LOAN SERVICING LLC
## TO MODIFY STAY OR FOR ADEQUATE PROTECTION

Specialized Loan Servicing LLC, as servicing agent for U.S. Bank National Association, as Indenture Trustee of the GMACM Home Equity Loan Trust 2006- HE4("Movant"), a party in interest, respectfully represents:

1.      The Bankruptcy Court has jurisdiction over this proceeding pursuant to Local Rule 29.01 of the United States District Court for the District of South Carolina, and 28 U.S.C. Section 157.

2.      Debtor filed for relief under Chapter 7 of the United States Bankruptcy Code on May 22, 2018.  John K. Fort was appointed Trustee.

3.      Movant is the holder of a  claim against the Debtor in the amount of $92,272.10 as of this filing, plus interest and costs.  Copies of the Loan, Mortgage, and Assignment of Mortgage are attached hereto and incorporated herein by reference as Exhibits.  Specialized Loan Servicing LLC services the loan on the property referenced in this motion. In the event the automatic stay in this case is modified, this case dismisses, and/or the Debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of Movant or Movant's successor or assignee.  Movant, directly or through an agent, has possession of the Note. The Note is either made payable to Movant or has been duly endorsed. Movant is the original mortgagee or beneficiary or the assignee of the Mortgage. The collateral consists of real estate located at 6350 Platt Springs Rd, Lexington, South Carolina  29073-8304.

4.      Movant does not have and has not been offered adequate protection for its interest in the collateral.

5.      On information and belief, the Debtor has no equity in the collateral as it appears he has moved to Statesboro, GA 30458 and has not complied with this Court's Order of June 12,

1

2018.

6.    The Debtor continues to use the collateral without making required payments thereon to the further detriment of Movant.

7.    Upon information and belief, the Debtor was to be making the payments directly to Movant which payments are not being remitted as called for by the loan and mortgage.

8.    Upon information and belief, the property is not necessary for an effective reorganization.

9.    If Movant is not permitted to foreclose its security interest in the collateral, it will suffer irreparable injury.

10.    Should this Court fail to grant Movant's request for relief from the automatic stay, Movant requests that this Court require Debtor to provide it with adequate protection.

11.    Movant agrees to waive any claim that may arise under 11 U.S.C. Section 503(b) or 11 U.S.C. Section 507(b) that may result following the entry of an Order in this matter, and Movant further agrees that any funds realized in excess of its debt will be paid to the Trustee if Movant is granted relief to enforce its security interest and state law rights in its collateral.

12.    Movant respectfully requests that this Court vacate the stay of Judgment pursuant to F.R.B.P. 4001(a) (3) to avoid further injury to Movant.

WHEREFORE, Movant prays for entry of an order for relief against the Debtor under Section 362(d)(1) and (2) or for adequate protection under Section 363(e) of the United States Bankruptcy Code, and for such other relief as this Court deems just.

JOHNSON LAW FIRM, P.A.

Lawrence W. Johnson, Jr.
District Court ID #2200
Post Office Box 883
Columbia  SC  29202
(803) 771-1500
Attorney for Specialized Loan Servicing LLC

Columbia, South Carolina

June 29, 2018

2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:      )  Bankruptcy Case No: 18-02673-hb
         )  Chapter 7
  Samuel Nimrod Smith )
  aka Sam N Smith   )
         )
   Debtor.    )
_____)

## CERTIFICATION OF FACTS

  In the above-entitled proceeding, in which relief is sought from the automatic stay in accordance with 11 U.S.C. §362, I do hereby certify to the best of my knowledge, the following:

1. <u>Nature of Movant's Interests:</u>
  Secured.

2. <u>Brief Description of Security Interest, copy attached (if applicable):</u>

  (see copies attached to Motion to Modify Stay filed herewith).

3. <u>Description of property encumbered by stay (include serial number, lot and block number, etc.):</u>
  Real estate located at 6350 Platt Springs Rd., Lexington, SC 29073-8304

4. <u>Basis for relief (property not necessary for reorganization, debtor has no equity, property not property of the estate, include applicable subsection of Section 362):</u>

   For cause, lack of adequate protection, Section 362(d)(1); lack of necessity to reorganization, Section 362(d)(2); lack of adequate protection, Section 363(e).

5. <u>Prior adjudication by other Courts, copy attached (decree of foreclosure, order for possession, levy of execution, etc., if applicable).</u>  None

1

6.    <u>Valuation of property, copy of valuation attached (appraisal, blue books, etc.):</u>

| | |
|---|---|
| Fair Market Value | $170,000.00 |
| Senior Liens | $unknown |
| Movant's Lien | $92,272.10 |
| Other Liens | $ |
| Net Equity | $unknown |

Source/Basis of Value–April 21, 2018 BPO–No schedules by debtor

7.    <u>Amount of Debtor's estimated equity (using figures from paragraph 6, supra):</u>

$ Unknown

8.    Month and Year in Which First Direct Post-Petition Payment Came Due to Movant (if applicable). <u>June, 2018</u>

9.    (a)    Detailed Listing of all directly received Post-petition payments showing dates of receipt, amount and application date. <u>No payments</u>

(B)    For Objecting Party: List all post-petition payments, listed by Movant in (a) above, disputed as having been made. Attach written proof of such payments or a statement why such proof is unavailable at the time of filing of this Objection.

10.    Month and Year for which Post-Petition account is Due as of this Motion. <u>August, 2016</u>

Attorney for Movant:      Lawrence W. Johnson, Jr. DCID No: 2200
                          JOHNSON LAW FIRM, P.A.

Representing:             Specialized Loan Servicing LLC

Address:                  Post Office Box 883
                          Columbia, South Carolina  29202

Telephone:                (803) 771-1500

Columbia, South Carolina

June 29, 2018

2

Loan No.: ▉▉▉▉▉▉▉

Credit Limit: $99,600.00

### SECONDARY MORTGAGE LOAN
### LENDER MORTGAGE
### HOME EQUITY LINE OF CREDIT
### AGREEMENT AND DISCLOSURE STATEMENT

1. **INTRODUCTION.** In this  GMAC Mortgage, LLC dba ditech.com                Home Equity Line of Credit Agreement and Disclosure Statement, as amended and extended, Exhibit A hereto and the Addendum (this "Agreement), "LENDER" refers to                     GMAC Mortgage, LLC dba ditech.com "We", "us", "you," "your" and "our" refer to the person or persons who sign this Agreement as borrower(s).

LENDER will open a Home Equity Line of Credit account (the "Account") for us when we sign this Agreement. A mortgage or deed of trust (collectively the "Mortgage") also must be signed so that advances under the Account will be secured by the mortgaged property (the "Property") identified in the Mortgage. This Agreement and the Mortgage, taken together, are called the "Credit Documents". By signing, we acknowledge that we have read the Credit Documents and we agree to use the Account on the terms set forth below.

We acknowledge that LENDER has provided us with the home equity brochure published by the Federal Reserve Board and a document entitled "Important Terms of your Home Equity Line of Credit Account" (the "Important Terms Disclosure"). Further, we acknowledge that LENDER has fulfilled all of its promises set forth in the Important Terms Disclosure with respect to providing additional information upon our request.

After giving notice of default, LENDER may end our right to advances under the Account, reduce the Credit Limit and/or demand repayment at once of all amounts outstanding under the Account in the circumstances described in paragraph 12(b). LENDER may also halt advances or reduce the Credit Limit, under the circumstances and for the period described in paragraph 12(c).

2. **PROMISE TO PAY.** We promise to pay LENDER all monies advanced under the Credit Documents, including LENDER's out of pocket costs shown as Initial Charges on Exhibit A. This amount at any time is called the "Earning Balance Outstanding". We also promise to pay LENDER all FINANCE CHARGES under paragraph 6 and all fees and charges under paragraph 7 ("Special Charges"). This total of accrued Finance Charges and Special Charges at any time is called the "Non Earning Balance Outstanding". The sum of the Earning Balance Outstanding and the Non-Earning Balance Outstanding is called the "Total Balance Outstanding".

3. **OUR INDIVIDUAL LIABILITY.** LENDER may enforce its rights under this Agreement against any one of us or against all of us.

4. **USING THE ACCOUNT.** The term of this Account will consist of a "Borrowing Period" and a "Repayment Period". During the "Borrowing Period", we may borrow any amounts, up to the Credit Limit shown on the first page of this Agreement. The "Borrowing Period" begins on the "Trigger Date" and ends on the 10th anniversary of the "Agreement Date". The "Repayment Period" begins on the day after the 10th anniversary of the "Agreement Date" and will continue until the 15th anniversary of the "Agreement Date". The "Agreement Date" is date below our signatures on this Agreement or the date the Mortgage was notarized, whichever is later. The "Trigger Date" is the first day after our right to cancel the Account expires.

During the Borrowing Period we may obtain cash advances and goods by presenting Home Equity checks ("Checks") issued to us by a bank or banks selected by LENDER (the "Check Bank(s)"). Each initial and subsequent Check must be written for at least $250 except for the residents of Alabama and Mississippi, where the initial Check must be at least $2000. For residents of Kentucky the initial Check must be at least $15,100. The Check Bank will not cash Checks for us.

Also, LENDER may with its prior approval allow us to obtain from the Check Bank and if the services and/or programs are available:  (a) wire transfers; (b) cashier's checks and/or (c) a credit card for the Account which will allow you to obtain: (i) cash advances and (ii) goods and/or services ("Purchases") from participating merchants and ATMS to the extent permitted by law.

We may not borrow from the Account during the Repayment Period.

LENDER is not responsible if anyone refuses to accept a Check, wire transfer, cashier's check and/or credit card from your Account.

5.    **NATURE OF THE ACCOUNT.**

(a)    **AVAILABLE CREDIT DURING THE BORROWING PERIOD.** During the Borrowing Period the Account is a revolving credit line. The maximum amount of credit available to us ("Available Credit") is the Credit Limit less the sum of the amount of all unpaid advances under the Credit Documents and other unpaid fees and charges. Any payment which is applied against the Earning Balance Outstanding increases Available Credit 15 calendar days after the payment is received. There is no Available Credit available to us during the Repayment Period.

(b)    **ADVANCES.** The Check Bank will notify LENDER daily of any Checks, wire transfers, cashier's checks, cash advances and/or Purchases it has paid and LENDER will promptly pay the Check Bank on our behalf for any of your Checks, wire transfers, cashier's checks, cash advances and/or Purchases that it has paid. However, LENDER may elect either to honor or to refuse to honor: (i) any Check, wire transfer or cashier's check which is less than $250, is postdated, improperly completed, presented to the Check Bank more than six months after the Check, wire transfer or cashier's check is dated, or (ii) any Check, wire transfer, cashier's check, cash advance and/or Purchase for an amount which exceeds our Available Credit at the time the Check, wire transfer, cashier's check, cash advance and/or Purchase is presented to the Check Bank (iii) any Check, wire transfer, cashier's check, cash advance and/or Purchase if an Event of Default as defined in Section 12 has occurred, (iv) any Check, wire transfer, cashier's check or cash advance intended to be used in payment of all or part of the amount we owe LENDER on the Account, or (v) any Check, wire transfer, cashier's check, cash advance and/or Purchase which is dated after the Borrowing Period ends.

6.    **FINANCE CHARGES.**

(a)    **DAILY RATE.** At the end of each day, LENDER will multiply the Earning Balance Outstanding (to get the Earning Balance Outstanding, LENDER takes the beginning balance of the account each day (which includes any Initial Charges, monies previously advanced for Checks, wire transfers, cashier's checks, cash advances and/or Purchases) and adds all monies advanced on that day for Checks, wire transfers, cashier's checks, cash advances and/or Purchases then LENDER subtracts any payments or credits posted as of that day: this gives LENDER the Earnings Balance Outstanding) by a Daily Rate equal to the ANNUAL PERCENTAGE RATE for that day divided by 365 (366 days in a leap year). The result is the FINANCE CHARGE for that day. The sum of these daily FINANCE CHARGES during a monthly billing cycle is the FINANCE CHARGE for the billing cycle.

The ANNUAL PERCENTAGE RATE is based on the value of an index plus a margin and is calculated daily according to the method set forth in the Addendum. The ANNUAL PERCENTAGE RATE is a simple interest rate. The index is the Prime Rate as defined in paragraph 6(c).

In addition, recent Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATES are shown on the Addendum.

(b)    **MAXIMUM ANNUAL PERCENTAGE RATE.** Notwithstanding any language in this Agreement to the contrary, the ANNUAL PERCENTAGE RATE will never exceed the Maximum Annual Rate shown on the Addendum.

(c)    **PRIME RATE.** The Prime Rate for any date (the "Rate Date") is the "prime rate" (or high point of any range of "prime rates") established for the Rate Date by the financial institutions surveyed by The Wall Street Journal in publishing its "Money Rates" (or any replacement) Table. The Prime Rate for the Rate Date will appear in The Wall Street Journal in publishing its publication date after the Rate Date. If for any reason no such information is published in The Wall Street Journal on its first consecutive days immediately after the Rate Date, and if the New York Times is then publishing a similar table that only includes the "prime rates" of financial institutions surveyed by The Wall Street Journal immediately prior to such time, LENDER will use the appropriate New York Times table until The Wall Street Journal resumes publishing the necessary information. If neither newspaper publishes such information for the four consecutive days immediately after the Rate Date, LENDER will select a substitute index that produces a similar rate, that is publicly available and that is beyond LENDER's control. We understand that a bank's "prime rate" is just a pricing index and is not necessarily the lowest rate charged by a bank.

(d)    **VARIABLE RATE.** Increases or decreases in the ANNUAL PERCENTAGE RATE and the Daily Rate take effect daily based on changes in the Prime Rate and if provided in the Addendum in the Earning Balance Outstanding. We will not be given any advance notice of changes in these Rates. An increase in these Rates will increase our minimum monthly payment.

(e)    **WHEN FINANCE CHARGES BEGIN.** FINANCE CHARGES on Initial Charges shown on Exhibit A begin on the date these charges are charged to my Account. FINANCE CHARGES on any payment except for checks begin on the date LENDER makes payment. FINANCE CHARGES on a Check begin on the date it is presented to the Check Bank. There is no grace period when FINANCE CHARGES do not accrue.

(f)    **COMPLIANCE WITH RATE LIMITS.** Notwithstanding any other provision of this Agreement, we will not have to pay any FINANCE CHARGES, Initial Charges or Special Charges higher than permitted by law. If it is finally determined that there would be an overcharge, but for this paragraph 6(f), the charge will be reduced to the maximum allowed by law. The amount of any prior overcharge will be used to reduce the Total Balance Outstanding and the remainder will be refunded to us. No credit or refund will cure or waive any default by us.

(g)   **NATURE OF FINANCE CHARGES.** The ANNUAL PERCENTAGE RATE includes only interest and not other charges.

7.   **SPECIAL CHARGES.**

(a) **LATE CHARGE.**

(i) If you are a resident of the *District of Columbia, Florida, Indiana, Iowa, Maine, Massachusetts, Michigan, North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina* or *Wyoming* we will not be required to pay a late charge even if your payment is not made by the due date.

(ii) If you are a resident of *New York* and LENDER does not receive any month's minimum payment within 15 days after the payment due date we will be required to pay a late charge equal to the lesser of $20 or 2% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(iii) If you are a resident of *Idaho, Kansas, Kentucky, Mississippi, Oregon* or *Utah* and LENDER does not receive any month's minimum within 15 days of the payment due date we will be required to pay a late charge equal to the lesser of $20 or 4% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(iv) If you are a resident of *Wisconsin* and LENDER does not receive any month's minimum payment within 15 days of the payment due date we must pay a late charge equal to $10.

(v) If you are a resident of *Alabama, Alaska, Connecticut, Delaware, Maryland, Minnesota, Nebraska, Nevada, New Mexico, New Hampshire,* or *Vermont* and LENDER does not receive any month's minimum payment by the due date shown on statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(vi) If you are a resident of *Montana* and LENDER does not receive any months minimum payment by the due date shown on statement for the month we will pay a late charge equal to the lesser of $15 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charges.

(vii) If you are a resident of *Arizona, California, Colorado* or *Georgia* and LENDER does not receive any month's minimum payment within 10 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(viii) If you are a resident of *Tennessee* and LENDER does not receive any month's minimum payment within 5 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(ix) If you are a resident of *Virginia* and LENDER does not receive any month's minimum payment within 7 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(x) If you are a resident of *Illinois, Missouri, New Jersey, Pennsylvania* or *Washington* and LENDER does not receive any month's minimum payment within 15 days of the payment due date as shown on our statement for that month, we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(xi) If you are a resident of *Louisiana* and LENDER does not receive any month's minimum payment within 10 days of the payment due date as shown on the statement for that month, you will be required to pay a late charge equal to the lesser of $15 or 5% of the amount of the delinquent minimum payment due.

(xii) If you are a resident of *North Dakota* and LENDER does not receive any month's minimum payment within 15 days of the due date you will pay a late charge equal to the lesser of $15.00 or 5% of the excess of (i) the unpaid amount of such payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(b) **ANNUAL FEE.** If you are a resident of *Kansas, Kentucky, Maine, Maryland, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, Wyoming* or the *District of Columbia* you will not have to pay an annual fee. If you are a resident of: a. *Illinois* you will pay an annual fee of $ 20.00; b. *Iowa* you will pay an annual fee of $15.00; c. *Louisiana* you will pay an annual fee of $12.00; d. *Florida* you will pay an annual fee of $25.00; e. *Ohio* you will pay an annual fee equal to the lesser of $35.00 or ½% of your available credit on the date the annual fee is charged to your account or f. if you are resident of any other state your annual fee will be $35.00. The annual fee will be billed on the first anniversary of this Agreement, is non-refundable and constitutes a FINANCE CHARGE.

The annual fee will be billed to us each year in the same month this Agreement is signed. LENDER will waive the annual fee if you accrue at least $100.00 of FINANCE CHARGES in the year immediately preceding the date in which the Annual Fee is charged in which case the annual fee constitutes a FINANCE CHARGE.

(c)   **HANDLING COSTS.** To the extent permitted by law, we will pay the following fees: (i) $25.00 for stopping the payment of any Check that you request to be not paid and (ii) $2.00 for each copy of a Check, sales draft or additional monthly billing statements that we request. However, LENDER will not charge handling costs for items requested due to a billing error inquiry.

8.   **PAYMENTS.**

(a)   **MINIMUM PAYMENT EACH MONTH.** During the Borrowing and Repayment Periods we agree to pay at least the amount of the minimum payment shown on each monthly billing statement by the payment due date on the statement. To figure the minimum payment during the Borrowing Period for a billing cycle, LENDER will add all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 respectively during the billing cycle and all overdue payments from prior billing cycle. The minimum payment is the lesser of the sum of this amount described immediately above or the Total Balance Outstanding at the end of the billing cycle period. The minimum payment for a billing cycle during the Repayment Period will be the sum of: (i) all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 accrued during the billing cycle; (ii) all overdue payments from prior billing cycles and (iii) the greater of $50.00 or 1.667% of the Earning Balance Outstanding at the end of the Borrowing Period. In addition, we will be required to repay LENDER any excess of the Earning Balance Outstanding over our Credit Limit.

(b)   **PREPAYMENT.** We may prepay the Total Balance Outstanding in full or in part at any time without penalty.

(c)   **MATURITY DATE.** We understand that making the minimum payment each month during the Borrowing Period will not result in any reduction of the Earning Balance Outstanding. Making the minimum payment each month during the Repayment Period will reduce the Earning Balance Outstanding. Unless we have paid off the Total Balance Outstanding and canceled the Account or LENDER terminates the Account before the end of the Repayment Period (the "Maturity Date") we will pay the remainder of the Total Balance Outstanding in a single payment which may be a balloon payment. See paragraphs 12(b) and 14. The Account will terminate after this final payment.

(d)   **APPLICATION OF PAYMENTS.** Payments will be applied first against finance charges from prior billing periods, next against billed principal from prior billing periods, then special charges from prior billing periods, then against outstanding principal, next to finance charges from the current billing cycle and then to special charges from the current billing cycle.

(e)   **STATEMENTS CONCERNING PAYMENTS.** LENDER may ignore statements such as "payment in full" on any check (or which accompany any check) which we send in payment of any amount owed by us. LENDER may deposit such check without notifying us and without its deposit being a settlement of the amount owed. Any such check will be applied as described in paragraph 8(d).

9.   **MONTHLY STATEMENT.** LENDER will send us a statement for each monthly billing period in which we make a payment on the Account or in which the amount due is $1.00 or more.

10.   **SECURITY.** The Mortgage gives LENDER a lien on the Property to the extent of the Total Balance Outstanding at any time and is made a part of this Agreement by reference. The Mortgage describes insurance we must maintain on the Property. Although we may choose the insurance company, LENDER has the right to refuse to accept our choice for reasonable cause.

11.   **TRANSFER OF RIGHTS AND DUTIES.** The Account is our personal obligation, and LENDER is relying on us to repay the amounts it advances. We agree not to transfer our credit privileges or our payment duties to another person without LENDER's prior written consent. However, LENDER may transfer its rights and duties at any time with or without notice. Our heirs, successors and assigns shall be bound by all of our duties, and our approved assigns will have all of our rights. LENDER's successors and assigns shall be bound by all of LENDER's duties and will have all of LENDER's rights.

12. **EVENTS OF DEFAULT.**

(a) **NOTICE.** The events set forth in paragraphs 12(b) and 12(c) are Events of Default if and when LENDER gives any person (other than LENDER) who has signed a Credit Document ("Signer") notice of default. We agree to notify LENDER promptly upon the happening of any event that would be an Event of Default.

(b) **TERMINATION EVENTS.** In any of the events described in this paragraph 12(b), LENDER may give notice of default. Upon or after giving such notice, LENDER may permanently end our right to advances under the Account, may reduce our Credit Limit and/or, either immediately or at such later time as LENDER elects, may demand repayment at once of the Total Balance Outstanding.

(i)    There has been fraud or material misrepresentation by us in connection with the Account;

(ii)    We have failed to meet the repayment terms of this Agreement for any amount outstanding; or

(iii)    To the extent permitted by law, any action or inaction by you has adversely affected the Property or any right of LENDER in the Property; to the extent permitted by law, this will include, but not be limited to, (or any legal representative or successor of yours) you agreeing to sell, transfer, or assign or selling, transferring or assigning any interest in the Property without the prior written consent of LENDER.

(c)    **SUSPENSION EVENTS.** In any of the events described in this paragraph 12(c), LENDER may give notice of default. LENDER may freeze advances (not permit us to access our Account for additional advances) or reduce the Credit Limit if any of the events described below occur. LENDER will notify us if our Account is frozen or if our Credit Limit is reduced. If the reason for such action no longer exists and we would like our credit privileges reinstated, then it is our responsibility to deliver to LENDER a written request for reinstatement of credit privileges, with evidence that the event(s) causing the suspension have been cured. We promise that we will include with any request for reinstatement any evidence reasonably necessary to show that the event(s) in question have ended. If, after reasonable investigation, LENDER agrees that the event(s) resulting in such action no longer exist and that no other conditions that would permit such action currently exist, then LENDER will reinstate our credit privileges.

The following events give rise to these consequences:

(i)    The value of the Property declines significantly below the appraised value of the Property used by LENDER in deciding to open the Account;

(ii)    LENDER reasonably believes that we will be unable to fulfill our repayment obligations under the Account because of a material change in our financial circumstances;

(iii)    Signers are in default of any of the following obligations under the Credit Documents, which we agree are material:

(A)    paragraph 12(c) of the Agreement, requiring evidence of the end of an Event of Default;

(B)    paragraph 15(c) of the Agreement, prohibiting conflicting instructions [or court orders];

(C)    paragraph 15(e) of the Agreement, requiring notice of lost or stolen Checks and/or credit cards;

(D)    paragraph 15(g)(ii) of the Agreement, requiring notice of adverse changes in our credit or financial condition or the value of the Property and requiring compliance with reasonable LENDER requests for information;

(E)    paragraph 3 of the Mortgage, prohibiting prior mortgages, deeds of trust, charges and liens on the Property;

(F)    paragraph 4 of the Mortgage, regarding hazard insurance and condemnation;

(G)    paragraph 5 of the Mortgage, regarding maintenance of the Property;

(H)    paragraph 6 of the Mortgage, regarding protecting LENDER's security;

(I)    if applicable, paragraph 1 of the Condominium Rider or Planned Unit Development Rider to the Mortgage, requiring payment of condominium or planned unit development obligations;

(J)    if applicable, paragraph 2 of the Condominium Rider, regarding notice of a lapse of insurance coverage; or

(K)    if applicable, paragraph 4 of the Condominium Rider or Planned Unit Development Rider, prohibiting certain actions without LENDER's consent;

(iv)    The Maximum Annual Percentage Rate provided for in paragraph 6(b) is reached; or

(v)    The priority of the Mortgage is adversely affected by government action to the extent that the value of the equity in the Property after liens prior to the Mortgage is less than 120% of the Credit Limit.

(vi)    LENDER is prevented by any government action from applying to my Account the Annual Percentage Rate that is provided for in this Agreement.

(vii)    LENDER is notified by its regulatory agency that continued advances would constitute an unsafe and unsound practice.

.

initial

(d)    **CURE, ETC.** Notwithstanding any language in this Agreement to the contrary, LENDER will not take any action upon an Event of Default unless permitted by applicable law and LENDER will give us any grace period, right to cure and/or reinstatement right required by applicable law. However, we understand and agree that this paragraph 12 is intended to give LENDER all rights permitted by applicable law.

(e)    **RETURN OF CHECKS AND CREDIT CARDS.** Upon the occurrence of an Event of Default as set forth in Paragraph 12(b), we will promptly return all unused Checks and credit cards to LENDER.

(f)    **FORECLOSURE.** If we do not repay the Total Balance Outstanding at once when due, LENDER may exercise any right available to it under applicable law, including foreclosure.

13.    **AMENDMENT OF AGREEMENT.** We agree that LENDER may amend this Agreement, without any further consent from us, if (a) the amendment is "insignificant" (as defined under applicable federal law) or (b) if the amendment will unequivocally benefit us throughout the remainder of the term of this Agreement. All other amendments to this Agreement shall require a written agreement between LENDER and us.

14.    **CANCELLATION BY US.** If we wish to close the Account, we must notify LENDER that we are closing our Account and return all unused Checks and credit cards. The notice must specify the Account number and an effective date of cancellation. The date of cancellation must be after LENDER receives the Notice. We will be responsible for all Checks signed by us whenever written as well as all credit card cash advances and/or Purchases made by us whenever made, and we will pay LENDER the Total Balance Outstanding on the cancellation date. We will not be released from our duties until this amount is paid. If LENDER receives a check which satisfies the Total Balance Outstanding LENDER may at its sole discretion consider the Account closed.

15.    **OTHER PROVISIONS.**

(a)    **WAIVER.** We agree that we will not be released from any of our obligations because LENDER releases or takes any additional security for the repayment of amounts owed. LENDER may waive or delay enforcing its rights without limiting its ability to exercise them in the future. Any waiver by LENDER shall be in writing and shall apply only to the extent stated in the writing. No waiver shall be regarded as a waiver of any other event.

(b)    **SATISFACTION, COLLECTION AND FORECLOSURE COSTS.** To the extent permitted by law, all satisfaction fees charged by any recording office for canceling the Mortgage will be billed to you, and to the extent permitted by law reasonable out of pocket costs (including attorneys' fees) incurred and projected by LENDER in enforcing its rights shall be included as additional indebtedness in any judgment or decree against us.

(c)    **JOINT ACCOUNTS; CONFLICTING INSTRUCTIONS.** If more than one person signs this Agreement, then this Account is a joint account and each signer will be individually responsible and liable for the entire account balance. If this is a joint Account, we agree not to give conflicting instructions regarding the Account. Nevertheless, in the absence of a court order, LENDER may comply with a request made by any of us (even if it conflicts with a request made by another one of us) or LENDER may refuse any request. LENDER may also give notice of an Event of Default under paragraph 12(c) if it receives conflicting instructions on the Account. If LENDER receives conflicting instructions, or a court order regarding the Account, it may refuse any request or dishonor any Check or credit card cash advance or Purchase, without notice to any of us.

(d)    **STOPPING PAYMENTS.** In order to stop payment on a Check, we must call the telephone number for customer inquiries shown on our most recent monthly billing statement. WHILE LENDER WILL MAKE A GOOD FAITH EFFORT TO STOP PAYMENT, LENDER DOES NOT GUARANTEE THAT PAYMENT ON ANY CHECK WILL IN FACT BE STOPPED.

(e)    **LOST OR STOLEN CHECKS AND/OR CREDIT CARDS.** We agree to contact LENDER immediately at the address or telephone number shown on our most recent monthly statement if we learn that any Check and/or credit card has been lost or stolen.

(f)    **GOVERNING LAW.** This Agreement will be governed by federal and Pennsylvania law. If any provision is invalid, illegal, or unenforceable, this Agreement will be interpreted as if such provision had never been included. We agree to fully cooperate in the correction and adjustment of any errors in the loan documents if deemed necessary or desirable by LENDER to comply with any law or regulation or to meet the terms and conditions of the loan approval.

(g)    **CREDIT INFORMATION.** (i) To the extent permitted by law, LENDER may disclose information about us, our performance under this Agreement, employment, credit, or other information: (1) to credit reporting agencies, (2) if LENDER reasonably believes disclosure necessary to ensure our compliance with the Credit Documents, or (3) if we give LENDER our written permission. We authorize LENDER to obtain reports from others (such as employers, creditors, lenders and credit reporting agencies) from time to time bearing on our credit status. This applies to each of us if this is a joint Account.

(ii)    We agree to notify LENDER promptly if there is any material adverse change in our credit or financial condition or the value of the Property. We also agree to provide LENDER with any updated information LENDER reasonably requests from time to time concerning our credit or financial condition or the value of the Property.

(h)    **TIME OF THE ESSENCE.** Time is of the essence in this Agreement.

(i)    **CHANGE OF ADDRESS, ETC.** We will give LENDER prompt prior notice of any change in our address, name or employment and we will give LENDER prompt notice if any of us dies by sending LENDER a certified death certificate if it requests one, is imprisoned or becomes legally incompetent.

(j)    **NOTICES.** Any LENDER notice shall be hand delivered or sent by first class, registered or certified mail to the address of the Property or such other address specified by the addressee in a written notice given to LENDER. Any LENDER notice shall be considered given on the day it is deposited in the U.S. mail or is hand delivered.

Any notice from us must be mailed to LENDER by first class, registered or certified mail to the address shown on our most recent monthly statement or to such other address specified by LENDER in a written notice given to us. Any such notice shall be considered given on the day it is received by LENDER.

(k)    **FAILURE TO MAKE ADVANCE.** We agree that LENDER will not be responsible if we cannot obtain an advance because of any cause beyond its reasonable control or if anyone refuses to accept a Check, wire transfer, cashier check and/or credit card.

(l)    **COPIES, ETC.** If LENDER sues to enforce this Agreement, LENDER may use a copy, microfilm, or microfiche of any Check, monthly statement or other document to prove what we owe LENDER. The copy, microfilm or microfiche can be used just like the original document.

(m)    **CREDIT BALANCES.** LENDER will not pay us interest on any credit balances.

(n)    **ANNUAL STATEMENT.** Within ten days after receipt of a written request from us, LENDER will deliver to us once per year and without charge a statement showing the date and amount of all payments on the account for the immediately preceding 12 month period, and the Total Balance Outstanding.

(o)    **USE OF FUNDS.** We agree to use all funds advanced to us for personal, family or household purposes.

(p)    **TAXES.** If taxes on mortgages or the debts they secure increase in any way after the date of the Mortgage, we shall pay the full amount of any such increase.

(q)    **TAX ADVICE.** We should consult a tax advisor regarding the deductibility of interest and charges under the Account.

(THIS SPACE INTENTIONALLY LEFT BLANK)

initial

## NOTICE TO BORROWER

You have the right to be represented by an attorney of your own choosing at the time this Agreement is signed.

Read the entire Agreement before you sign.

You are entitled to a copy of this Agreement.

You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with the law.

Do not sign this Agreement if it contains blank spaces.  All spaces should be completed before you sign.

This Loan Agreement is secured by a secondary mortgage on your real property.  Default in the payment of this loan may result in loss of the property securing this loan.

_____          _____
Samuel N. Smith

_____          _____
Date                                                          Date

6350 Platt Springs Rd, Lexington, SC  29073-8304

          *    *    *    *                                  *    *    *    *

_____          _____

_____          _____
Date                                                          Date

_____          _____

As used in the following notice, the terms "we", "us" and "our" refer to LENDER and the terms "you" and "your" refer to the person(s) who signs the Agreement as borrower(s).

## FAIR CREDIT BILLING ACT DISCLOSURES

**Your Billing Rights**
**Keep this Notice for Future Use**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

## Your Rights and Our Responsibilities After We Receive Your Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

initial

# Exhibit A

This Exhibit A is a part of and supplements your Home Equity Line of Credit Open-End Agreement ("Agreement").

**FEES AND CHARGES.** In addition to the Finance Charge I agree to pay these additional fees and charges:

| | |
|---|---|
| Loan Origination Fee | $ _____ |
| Loan Discount | $ _____ |
| Processing Fee | $ _____ |
| Application Fee | $ _____ |
| Credit Report Fee | $ _____ |
| Abstract or Title Search | $ 100.00 |
| Title Examination | $ _____ |
| Recording Fees | $ 14.00 |
| City/County Tax Stamps | $ _____ |
| State Tax Stamps | $ _____ |
| Mortgage Tax | $ _____ |
| State/Intangible Tax | $ _____ |
| Administration Fee | $ _____ |
| Title Insurance | $ _____ |
| Title Insurance (Lender Coverage) | $ _____ |
| Title Insurance (Owner Coverage) | $ _____ |
| Title Insurance Binder | $ _____ |
| Discount Points (Margin Buydown) | $ _____ |
| Settlement/Closing Fee | $ _____ |
| Document Signing Fee | $ 500.00 |
| | |
| **Total** | $ 614.00 |

Any amount listed for Discount Points, Loan Origination Fee, Loan Discount, Processing Fee, Application Fee, Administration Fee, Settlement/Closing Fee and Document Signing Fee constitute a **FINANCE CHARGE.**

If no amounts are listed above, then no additional fees and charges apply.

By signing this Exhibit A, I agree to repay the amounts set in this Exhibit A according to the terms and conditions set forth in Agreement.

_Samuel N. Smith_ _____
Samuel N. Smith

_12/20/2016_ _____
Date

_____
Date

_____
Date

_____
Date

_____
Date

_____
Date

initial

Loan No.: ███████

# ADDENDUM TO AGREEMENT

**THIS ADDENDUM TO AGREEMENT** (this "Addendum") modifies and supplements the Home Equity Line of Credit Agreement and Federal Truth-in-Lending Disclosure Statement (the "Agreement") that is being executed along with this Addendum. All terms defined in the Agreement have the same meanings in this Addendum. To the extent of any inconsistency with the Agreement, this Addendum shall control.

**1. DISCOUNTED RATE.** You will receive a discount during the first 3 months of the Borrowing Period, Daily Rates and corresponding variable ANNUAL PERCENTAGE RATES are not equal to the Prime Rate. Instead, the ANNUAL PERCENTAGE RATE for any day will be a fixed ANNUAL PERCENTAGE RATE of  8.25     % which equates to a daily rate of  0.02260   %.

**2. REGULAR VARIABLE RATE.** When the discount rate is not in effect the ANNUAL PERCENTAGE RATE equals Prime Rate plus a margin of  0.625     %. If the discounted rate was not in effect, the Daily Rate and corresponding variable ANNUAL PERCENTAGE RATE in effect as of the day you sign this Agreement is estimated to be as follows:

|  Daily Rate  |  Corresponding<br>ANNUAL PERCENTAGE RATE  |
|---|---|
|  0.02432 %  |  8.88   %  |

During the term of your Agreement this rate may vary. The maximum **ANNUAL PERCENTAGE RATE** that can apply during the term of the loan is the lesser of:  (a) ten percentage points (10.00%) over the index value the day before your Account is opened; or (b) the maximum percentage rate permitted by applicable law.

ADDM-2IOT  3/2005

2006-072141 FILED, RECORDED, INDEXED
2006-12-29 10:42:35:373
REC FEE: $14.00   ST FEE: $0.00
CO FEE: $0.00   Pages: 8
Lexington County R.O.D. Debra M. Gunter
MORTGAGE Bk:Pg 11646:335

Loan No.: ▉▉▉▉▉▉
Loan Product:  Interest Only Equity Line



This instrument prepared by:
Matthew Barlow
GMAC Mortgage, LLC dba ditech.com

# MORTGAGE

## THIS MORTGAGE SECURES OBLIGATORY FUTURE ADVANCES

MIN ▉▉▉▉▉▉▉▉▉

THIS MORTGAGE, as amended and extended (this "Mortgage") is signed to secure advances under a GMAC Mortgage, LLC dba ditech.com        Home Equity Line of Credit agreement (the "Agreement");  it is dated as of   December 20, 2006        , and is made by
Samuel N Smith and Mary F Smith, husband and wife
who reside(s) at  6350 Platt Springs Rd, Lexington, SC 29073-8304                , as mortgagor(s), in favor of  GMAC Mortgage, LLC dba ditech.com         , 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626 , as mortgagee. Borrower irrevocably mortgages, grants, and conveys to the Mortgage Electronic Registration Systems Inc. PO Box 2026 Flint, MI 48501-2026 (MERS) acting solely as a nominee for Lender and Lender's successors and assigns.

Throughout this Mortgage, "we", "us" and "our" refer to mortgagor(s).  "LENDER" refers to GMAC Mortgage, LLC dba ditech.com        or its assigns. The "Account" refers to the Home Equity line of credit agreement established by LENDER under the Agreement.  "Borrower" refers to each person who signs the Agreement as borrower.

## DESCRIPTION OF SECURITY

By signing this Mortgage, we hereby mortgage, grant and convey to MERS acting solely as a nominee for LENDER,       subject   to   the   terms   of   this   Mortgage,   (a)   the   real   estate   located   at 6350 Platt Springs Road, Lexington                , County of Lexington          , South Carolina 29073-8304 , more fully described in Schedule A; (b) all buildings or other structures on the property; (c) all rights we may have in any road, alley easement or license regarding the property or in any mineral, oil, gas or water which is part of the property; (d) all rents and royalties from the property; (e) all proceeds of any insurance on the property; (f) all proceeds of any taking (or threatened taking) of the property by any governmental authority; and (g) all fixtures on the property at any time (collectively, the "Property").

The Property includes all rights and interests which we now have or which we may acquire in the future. For example, if the security mortgaged under this mortgage is a leasehold estate and we subsequently acquire fee title to the Property, the rights and interests granted to MERS acting solely as a nominee for LENDER by this Mortgage will include the fee title that we acquire.  In all events if this Mortgage is a first mortgage, and to the extent permitted by law if this Mortgage is a second mortgage, this mortgage is also a security agreement under the South Carolina Uniform Commercial Code and we hereby grant MERS acting solely as a nominee for LENDER a security interest in the personal property described in (d) through (g) above.

## SECURED OBLIGATIONS
### THIS MORTGAGE SECURES OBLIGATORY FUTURE ADVANCES.

We have signed this Mortgage to secure (a) the payment to LENDER of up to $ 99,600.00        (the "Credit Limit"), plus FINANCE CHARGES and any other amounts due LENDER under the Agreement; (b) the performance under the Agreement of each Borrower; and (c) our performance under this mortgage. The Agreement and this Mortgage taken together, are called the "Credit Documents".

## PRIORITY OF ADVANCES

The lien of this Mortgage will attach on the date this Mortgage is recorded. The indebtedness evidenced by the Credit Documents is a revolving indebtedness. The Credit Documents provide that amounts may be advanced, repaid and readvanced from time to time in accordance with the terms and provisions of the Agreement. Accordingly, the aggregate advances during the term of the Credit Documents may exceed the Credit Limit. However, the Total balance Outstanding less FINANCE CHARGES at any time (the "Earning Balance Outstanding") shall never exceed the Credit Limit, except for advances made to protect the lien of this Mortgage. We agree that the lien and security title of this Mortgage shall not be deemed released or extinguished by operation of law or implied intent of the parties if the Total Balance Outstanding is zero as of the date of this Mortgage or is from time to time reduced to zero by payments made to LENDER.

## PROMISES AND DUTIES

We promise that, except for Permitted Liens; (a) we own the Property; (b) we have the right to mortgage the Property to LENDER; and (c) there are no outstanding claims or charges against the Property. The term "Permitted Lien" means (x) any mortgage, deed to secure debt or deed of trust ("security instrument") disclosed to LENDER on Borrower's application for the Account, to the extent that the amount secured by such security instrument does not exceed the amount disclosed on such application; and (y) any liens, claims and restrictions of record that do not individually or collectively have a material adverse impact upon LENDER's security, the value of the Property or the Property's current use.

Initial ▉▉▉

GMAC-SC

-1-

Each of us gives a general warranty of title of LENDER. This means that each of us will be fully responsible for any losses which. LENDER suffers because someone has rights in the Property other than Permitted Liens. We promise that we will defend our ownership of the Property against any claims of such right.

We will neither take nor permit any action to partition, subdivide or change the condition of title to all or any part of the Property. We will not amend any prior mortgage without LENDER's prior written consent.

TO HAVE AND TO HOLD, all and singular the Property unto LENDER, its successors or assigns, forever.

**CERTAIN PROVISIONS OF THE AGREEMENT**

We understand that LENDER may, under certain circumstances set forth in the Agreement, cancel its obligation to make further advances and/or require repayment at once of the Total Balance Outstanding.

Under the Agreement, FINANCE CHARGES based on the "prime rate" published in The Wall Street Journal or in certain circumstances the "prime rate" published in The New York Times or a similar index selected by LENDER. The rate of FINANCE CHARGES changes on a daily basis as the index or the amount outstanding under the Agreement increases or decreases. We understand that we will not receive advance notice of such changes.

**PROMISES AND AGREEMENTS**

We agree with LENDER as follows:

1.  **TIMELY PAYMENT.** Except as limited by paragraph 10 below, we shall pay when due all sums owed LENDER under the Credit Documents.

2.  **APPLICATION OF PAYMENTS.** All payments shall be applied by LENDER as set forth in the Agreement.

3.  **MORTGAGES AND DEEDS OF TRUST; CHARGES; CLAIMS.** We shall make payments when due and perform all our obligations under any mortgage, deed of trust or other security agreement on the Property.

We shall pay or cause to be paid when due all loans, taxes, assessments, charges, fines, impositions and rents of any kind relating to the Property ("Assessments"). Receipts evidencing such payments shall be delivered to LENDER upon its request. Except for Permitted Liens, we shall not allow any encumbrance, charge or lien on the Property to become prior to this Mortgage.

4.  **HAZARD INSURANCE; GOVERNMENTAL TAKINGS.**

(a) We shall, at our cost, keep all improvements on the Property insured against loss by hazards included in the term "extended coverage" and against loss by any other hazards LENDER may reasonably request to be covered. Hazard insurance shall be in an amount equal to the lesser of (i) the full replacement cost of the building that is part of the Property or (ii) the amount of this mortgage plus the total amount of all Permitted Liens. However, coverage will never be less than the amount necessary to satisfy any coinsurance requirement contained in the insurance policy.

We may choose the insurance company, subject to approval by LENDER which may not be reasonable withheld. All insurance policies and renewals must be in a form acceptable to LENDER and must include a standard mortgagee clause in favor of LENDER. LENDER shall have the right to hold the policies and renewals, subject to the terms of any Permitted Liens. If we pay the premiums directly, we shall provide LENDER with all renewal notices and, if requested by LENDER, all receipts for premiums. If policies and renewals are held by any other person, we shall supply copies of them to LENDER within ten calendar days after they are issued.

In the event of loss, we shall give prompt notice to the insurance company and LENDER. LENDER may file a proof of loss if we fail to do so promptly.

(b) The proceeds of any taking or threatened taking of the Property by a governmental authority shall be paid to LENDER, subject to any Permitted Liens. We shall give LENDER notice of any such threatened taking and sign all documents required to carry out this paragraph 4. No settlement relating to such a taking or threatened taking may be made without LENDER's prior written approval which shall not be unreasonable withheld.

(c) Subject to the terms of any Permitted Lien, LENDER may elect that the proceeds of any insurance, taking or threatened taking shall be applied to pay the debts secured by this Mortgage, repair or reconstruct the Property, and/or pay for our loss (after payment of all reasonable costs, expenses and attorneys' fees paid or incurred by LENDER and us.). The Credit Limit and Available Credit (as defined in the Agreement) shall be reduced to the extent that such proceeds are not used for repair and reconstruction. The receipt of proceeds shall not cure or waive any default under this mortgage or invalidate any act done pursuant to such notice.

If the Property is abandoned by us, or if we fail to respond to LENDER in writing within 30 calendar days from the date notice of a proposed insurance or condemnation settlement is given to us, LENDER may settle the claim, collect the proceeds and apply them as set forth above.

If the Property is acquired by LENDER, all of our right, title and interest in and to any insurance or condemnation proceeds shall become the property of LENDER to the extent of the sums secured by this Mortgage.

Initial

-2-

5. **MAINTENANCE OF THE PROPERTY; LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** We shall: use, improve and maintain the Property in compliance with law; keep the Property in good repair and pay when due all repair costs; prevent waste, impairment and/or deterioration of the Property; and comply with the provisions of any lease of the Property.

If the Property is a part of a condominium project or a planned unit development, we shall promptly perform all of our obligations under the governing documents of the project or development.

6. **PROTECTION OF LENDER SECURITY; LENDER AUTHORITY TO MAKE ADVANCES WITHOUT SPECIFIC REQUEST.** We shall appear in and defend any action or proceeding which may affect the security of LENDER under this Mortgage or result in violation of paragraph 3 above. If such an action is filed, we violate this Mortgage or Borrowers violate this Agreement, then LENDER may disburse funds and do whatever it believes necessary to protect the security of this Mortgage. In doing so, LENDER shall give us notice but it need not make demand or release us from any obligation.

We hereby authorize LENDER on our behalf and on LENDER's behalf to make any payments we are required to make under this Mortgage if we fail to do so. We appoint LENDER our attorney-in-fact for this purpose and agree that we may not end this appointment. All such payments will be treated as advances under the Agreement. However, we will repay these advances, together with FINANCE CHARGES on these advances, upon demand. In addition, we will repay LENDER upon demand any of its disbursements under the preceding paragraph, together with FINANCE CHARGES to the extent permitted by law. Until paid by us, all such amounts are secured by this mortgage even if they cause us to exceed the Credit Limit.

LENDER is not required to incur any expense or take any action under this Mortgage and no action taken shall release us from any duty.

7. **INSPECTION.** Representatives of LENDER may inspect the Property from time to time. Except in an emergency, LENDER must first give notice specifying reasonable cause for the inspection.

8. **FINANCE CHARGES AFTER END OF ACCOUNT AND/OR JUDGMENT.** We agree that FINANCE CHARGES after the end of the Account and/or after a judgment is entered shall continue to accrue at the rates and in the manner specified in the Agreement.

9. **OUR CONTINUING DUTIES AND LENDER'S RIGHTS; SURRENDER OF RIGHTS.** If this Mortgage is a first mortgage, to the extent permitted by law, for ourselves and our successors, we hereby surrender the benefit of all homestead, dower, curtesy, appraisement, valuation, redemption, reinstatement, stay, extension, exemption and moratorium laws now existing or hereafter enacted and any right to have the Property marshalled upon any foreclosure. We further agree that any court having jurisdiction to foreclose may order the Property sold as an entirety.

No surrender of any LENDER right under the Credit Documents shall release or limit our liability, or that of any person who subsequently becomes subject to our duties (a "successor"), nor shall any such surrender affect the claim or priority of this Mortgage. LENDER shall not be required to start proceedings against any successor or modify payment terms by reason of any demand made by us or any successor.

No LENDER act or failure to act shall constitute a surrender of any right under this Mortgage. All surrenders of rights must be in writing and signed by LENDER; they shall apply only to the extent and with respect to the event specified in the writing. Obtaining insurance, or paying taxes or other claims or charges shall not be a surrender of LENDER's right to demand payment at once of the sums secured by this Mortgage in the event of a default under the Credit Documents.

10. **SUCCESSORS AND ASSIGNS; JOINT AND SEVERAL LIABILITY; COSIGNORS.** This Mortgage shall bind us and our respective successors for the benefit of LENDER and any persons or entities that subsequently becomes entitled to LENDER's rights. All agreements made by us or any successor are "joint and several," which means that they may be enforced against each of us or any successor.

Any person who co-signs this mortgage but does not sign the Agreement (a) is co-signing only to mortgage that person's interest in the Property and to release all marital rights in the Property, (b) is not personally liable under the Credit Documents, without consent and without modifying the interests under this Mortgage.

11. **NOTICES.** All notices shall be in writing. Except where applicable law requires otherwise:

(a) LENDER notices shall be hand delivered or mailed by first class, registered or certified mail to the address of the Property or to such other address specified by the addressee in a written notice given to LENDER.

(b) Our notices shall be mailed to LENDER by first class, registered or certified mail to the address for such notices specified on our most recent monthly statement under the Agreement or to such other address specified by LENDER in a written notice given to us.

Subject to paragraph 22, a notice is considered given on the day it is deposited in the U.S. mail or is hand-delivered.

12. **GOVERNING LAW.** This Mortgage will be governed by federal and South Carolina law. If any provision is invalid, illegal, or unenforceable, this Mortgage shall be interpreted as if such provision has never been included.

Initial _____

- 3 -

13. **COPIES.** We shall receive copies of the Credit Documents and any other documents we sign at the time they are signed on or after this Mortgage is recorded.

14. **EXERCISING REMEDIES.** LENDER may exercise all of the rights and remedies provided by the Credit Documents or law, and any of these rights and remedies may be exercised individually or together, once or a number of times. The parties to this document are subject to the provision for Arbitration as set forth in the Agreement which is incorporated by reference as if set forth at length herein.

15. **EVENTS OF DEFAULT.**

(a) The events set forth in paragraph 15(b) are Events of Default if and when LENDER gives any Signer notice of default. We agree to notify LENDER promptly upon the happening of any event that would be an Event of Default under either Credit Document upon the giving of notice by LENDER.

(b) After giving notice of default, LENDER may end the Account and/or demand repayment at once of the Total Balance Outstanding in any of the following events:

(i) There has been fraud or material misrepresentation by any Signer in connection with the Account;

(ii) Borrowers have failed to meet the repayment terms of the Agreement for any amount outstanding; or

(iii) Any action or inaction by any Signer has adversely affected the Property or any right of LENDER in the Property; to the extent permitted by law, this will include, but not be limited to, any Signer (or any legal representative or successor of any Signer) agreeing to sell, transfer or assign or selling, transferring or assigning any interest in the Property, without the prior written consent of LENDER.

(c) Notwithstanding any language in this Mortgage to the contrary, LENDER will not give notice of default unless permitted by applicable law and LENDER will give us any grace period, right to cure and/or reinstatement right required by applicable law. This paragraph 15 is intended to give LENDER all rights permitted by applicable law.

16. **REMEDIES. IF BORROWERS DO NOT REPAY AT ONCE THE TOTAL BALANCE OUTSTANDING WHEN DUE, LENDER MAY EXERCISE ANY REMEDY AVAILABLE TO IT UNDER APPLICABLE LAW, INCLUDING FORECLOSURE.**

17. **APPOINTMENT OF RECEIVER.** Upon an Event of a Default or our failure to pay taxes assessed against the Property and/or insurance premiums on the Property (which we agree shall constitute waste), LENDER shall be entitled to the appointment of a receiver if permitted by law.

18. **SATISFACTION OF MORTGAGE.** Upon payment and discharge of all sums secured by this Mortgage and termination of the Account, this Mortgage shall be void and LENDER shall satisfy this Mortgage and file a discharge or release.

19. **REQUEST FOR NOTICES.** LENDER requests that copies of notice of default, sale and foreclosure from the holder of any claim which has priority over this Mortgage be sent to LENDER at 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626 .

20. **EXHIBITS, SCHEDULES AND RIDERS, ETC.** The terms of any Exhibit, Schedule or Rider attached to this Mortgage or executed and recorded with this Mortgage shall be treated as if fully set forth in this Mortgage. All of the Terms of the Agreement are made part of this Mortgage.

21. **TIME OF ESSENCE.** Time is of the essence in this Mortgage.

22. **ACTUAL KNOWLEDGE.** For purposes of the Credit Documents, LENDER shall not be deemed to have actual knowledge of any fact until it actually receives notice as set forth in paragraph 11 or until it receives written notice thereof from a source LENDER reasonably believes to be reliable. The date of receipt shall be determined by reference to "Received" date stamped on such written notice by LENDER or its agent.

23. **EXPENSES OF LITIGATION.** To the extent authorized by law, we must pay LENDER its attorneys' fees in the event LENDER must refer the Account for collection to an attorney licensed to practice in South Carolina who is not an officer, director or employee of LENDER. We shall also pay LENDER, to the extent authorized by law, any additional expenses incurred in the sale of the Property in foreclosure proceedings or upon the entry of a judgment.

24. **CAPTIONS; GENDER; ETC.** The headings in this Mortgage are not to be used to interpret or define its provisions. In this Mortgage, the masculine gender includes the feminine and/or neuter, singular number include the plurals, and plurals include the singular.

25. **NO CLAIM OR CREDIT FOR TAXES.** We will not make or claim credit on or deduction from the sums secured by this Mortgage by reason of any municipal or governmental taxes, assessments or charges upon the Property, nor will we claim any deduction from the taxable value of the Property by reason of this Mortgage.

26. **ASSIGNMENT OF RENTS; RECEIVERS; LENDER POSSESSION OF THE PROPERTY.** As additional security, we hereby assign to LENDER any rents due on the Property after an Event of Default or abandonment of the Property. In any action to foreclose this Mortgage, LENDER shall be entitled to an appointment of a receiver.

If an Event of Default occurs or we abandon the Property, LENDER, without notice, may enter upon, take possession of, and manage the Property. LENDER may then collect or sue in its own name for any rents due on the Property. All rents so collected shall be applied first to payment of the reasonable costs of operation and management of the Property (such as collection costs, receiver's fees, bond premiums and attorneys' fees) and then to the Total Balance Outstanding. LENDER and the receiver must account only for rents actually received.

Initial

Acts taken by LENDER under this paragraph 26 shall not cure or waive any Event of Default or invalidate any act done pursuant to notice of default.

We will not, without the written consent of LENDER, receive or collect rent from any tenant on the Property more than one month in advance. Upon an Event of Default, we will pay monthly in advance to LENDER or any receiver the fair and reasonable rental value of the Property or that part of the Property in our possession. If we fail to pay such rent, we will vacate and surrender the Property to LENDER or such receiver. We may be evicted by summary proceedings.

**27. MERS.** Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Mortgage, but, if necessary to comply with local law or custom MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of these interests, including, but not limited to, the right to foreclose and sell the property; and to take any action required of Lender including but not limited to, releasing and canceling this Mortgage.

By signing this Mortgage, we agree to all of the above. WE AGREE AND ACKNOWLEDGE THAT WE HAVE RECEIVED, WITHOUT CHARGE, TRUE COPIES OF THIS MORTGAGE AND ANY RIDER.

WITNESS the Hand(s) and Seal(s) of the Mortgagor(s) this ___ day of _____ in the year of our lord _____ of the Sovereignty and Independence of the United States of America.

Signed, Sealed and Delivered

In the Presence of:

_____          _____ (SEAL)
Witness                                Samuel N. Smith          MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

_____          _____ (SEAL)
Witness                                                         MORTGAGOR

- 5 -

STATE OF SOUTH CAROLINA

COUNTY OF _Lexing ton_                    PROBATE

*IMPORTANT:  THE SIGNATURE OF THE BORROWER(S) AND ALL WITNESSES MUST BE NOTARIZED.*

Travis A. Temple

PERSONALLY appeared before me the undersigned witness, who, after first being duly sworn, says that (s)he saw the within-named borrower sign, seal and deliver the within written mortgage; and that (s)he ✱ together with the other witness signature appears above, witnessed the execution thereof.

✱ Jon Peyser

                                        WITNESS  _Travis A. Temple_

SWORN and subscribed to before me
this _20_ day of _December_ _06_.

_____ (L.S.)
Notary Public for South Carolina
Jon Peyser
My commission expires: _8 24-07_

Prepared by & Return to:
TransContinental Title Co.
4033 Tampa Rd Suite 101
Oldsmar, FL 34677
800-225-7897

mrs

## SCHEDULE "A"

TRACT I

ALL THAT CERTAIN PIECE, PARCEL OR LOT OF LAND, WITH
IMPROVEMENTS THEREON, SITUATE, LYING AND BEING IN THE
COUNTY OF LEXINGTON, STATE OF SOUTH CAROLINA,
FRONTING ON PLAT SPRINGS ROAD, AND BEING MORE
PARTICULARLY SHOWN AND DELINEATED AS 1.39 ACRES, MORE
OR LESS, ON A PLAT PREPARED FOR G. MARTIN ARANT BY
SURVEY & MAPPING SERVICES OF SOUTH CAROLINA, INC.,
DATED MAY 23, 2000, AND RECORDED IN RECORD BOOK 8621,
PAGE 187, AND HAVING THE FOLLOWING BOUNDARIES AND
MEASUREMENTS: ON THE NORTHEAST BY PROPERTY NOW OR
FORMERLY OF G. MARTIN ARANT FOR A DISTANCE OF 290.00
FEET; ON THE SOUTHEAST BY PLATT SPRINGS ROAD FOR A
DISTANCE OF 210.00 FEET; ON THE SOUTHWEST BY PROPERTY
NOW OR FORMERLY OF G. MARTIN ARANT FOR A DISTANCE OF
290.00 FEET; AND ON THE NORTHWEST BY PROPERTY NOW OR
FORMERLY OF G. MARTIN ARANT FOR A DISTANCE OF 208.00
FEET.

BEING THE SAME PROPERTY CONVEYED TO SAMUEL N. SMITH
AND MARY F. SMITH BY DEED FROM G. MARTIN ARANT
RECORDED 06/13/2002 IN DEED BOOK 7277 PAGE 93, IN THE
R.M.C. OFFICE OF LEXINGTON COUNTY, SOUTH CAROLINA.

TRACT II

ALL THAT CERTAIN PIECE, PARCEL OR LOT OF LAND, WITH
IMPROVEMENTS THEREON, SITUATE, LYING AND BEING NEAR
WEST COLUMBIA, COUNTY OF LEXINGTON, STATE OF SOUTH
CAROLINA, AND BEING MORE PARTICULARLY SHOWN AND
DELINEATED AS 0.97 ACRES, MORE OR LESS, ON A PLAT
PREPARED FOR SAMUEL N. & MARY F. SMITH BY MARK W.
HALL, P.L.S., DATED FEBRUARY 14, 2004, AND RECORDED
IN PLAT BOOK 9213, PAGE 214, IN THE OFFICE OF THE
REGISTER OF DEEDS FOR LEXINGTON COUNTY, AND HAVING
SUCH BOUNDARIES AND MEASUREMENTS AS WILL MORE FULLY
APPEAR BY REFERENCE TO SAID PLAT.

BEING THE SAME PROPERTY CONVEYED TO SAMUEL N. SMITH
AND MARY F. SMITH BY DEED FROM G. MARTIN ARANT
RECORDED 04/27/2004 IN DEED BOOK 9213 PAGE 211, IN

## SCHEDULE "A"

THE R.M.C. OFFICE OF LEXINGTON COUNTY, SOUTH
CAROLINA.

TRACT III

ALL THAT CERTAIN PIECE, PARCEL OR LOT OF LAND, WITH
IMPROVEMENTS THEREON, SITUATE, LYING AND BEING NEAR
WEST COLUMBIA, COUNTY OF LEXINGTON, STATE OF SOUTH
CAROLINA, AND BEING MORE PARTICULARLY SHOWN AND
DELINEATED AS 0.155 ACRES, MORE OR LESS, ON A PLAT
PREPARED FOR SAMUEL N. & MARY F. SMITH BY MARK W.
HALL, P.L.S., DATED FEBRUARY 16, 2004, AND RECORDED
IN PLAT BOOK 9392, PAGE 113, IN THE OFFICE OF THE
REGISTER OF DEEDS FOR LEXINGTON COUNTY, AND HAVING
SUCH BOUNDARIES AND MEASUREMENTS AS WILL MORE FULLY
APPEAR BY REFERENCE TO SAID PLAT, WHICH PLAT IS BY
REFERENCE INCORPORATED HEREIN AND MADE A PART HEREOF.

BEING THE SAME PROPERTY CONVEYED TO SAMUEL N. SMITH
AND MARY F. SMITH BY DEED FROM G. MARTIN ARANT
RECORDED 07/06/2004 IN DEED BOOK 9392 PAGE 114, IN
THE R.M.C. OFFICE OF LEXINGTON COUNTY, SOUTH
CAROLINA.

2017024914 FILED, RECORDED, INDEXED
05/22/2017 14:50:44:657
REC FEE: $6.00    ST FEE: $0.00
CO FEE: $0.00    Pages: 1
Lexington County R.O.D. Tina Guerry
MORTGAGE ASST Bk:Pg 19222:204

When recorded return to:        Scott & Corley, PA
                                PO Box 2065
                                Columbia, SC 29202

MIN #:
MERS Phone Number: 1-888-679-

### ASSIGNMENT OF MORTGAGE

For Value Received, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR GMAC MORTGAGE, LLC DBA DITECH.COM**, whose address is P.O. Box 2026, Flint, MI 48501-2026, Assignor, does hereby assign, transfer and set over unto:

**U.S. Bank National Association, as Indenture Trustee of the GMACM Home Equity Loan Trust 2006- HE4**, whose address is c/o Specialized Loan Servicing LLC, 8742 Lucent Blvd, Suite 300, Highlands Ranch, CO 80129, its successors and assigns,

the following Mortgage made by **Samuel N. Smith and Mary F. Smith**, Mortgagor(s) to Mortgage Electronic Registration Systems, Inc., as nominee for GMAC Mortgage, LLC dba ditech.com, its successors and assigns, recorded 12/29/2006 in the Office of the Recorder of Deeds for Lexington County in Book 11646 at Page 335.

Secured by property commonly known as: **6350 Platt Springs Rd, Lexington, SC 29073**

Signed, sealed and delivered
in the presence of:

Witness # 1

Name: _____Zachary Suratt_____

Witness # 2

Name: __Jennifer Aveda__

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR GMAC MORTGAGE, LLC DBA DITECH.COM

By: _____

Name: __Mark Alan McCloskey__

Title: __Vice President__

Date: ___MAY 1 7 2017___

I, ____Geremy Gilbert____, a notary public for the state of ___Colorado___, do hereby certify that ___Mark Alan McCloskey___ as __Vice President__ of Mortgage Electronic Registration Systems, Inc., as nominee for GMAC Mortgage, LLC dba ditech.com, its successors and assigns personally appeared before me this day and acknowledged the due execution of the foregoing assignment.

WITNESS my hand and official seal
this __17__ day of ___MAY___, 2017.

_____
Notary Public for ___CO___

GEREMY GILBERT
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164036125
MY COMMISSION EXPIRES 09/19/2020

UNITED STATES BANKRUPTCY COURT

DISTRICT OF SOUTH CAROLINA

IN RE:                                          CASE NO:

                                                CHAPTER:


                                                CERTIFICATION OF FACTS



                                    DEBTOR(S)

In the above-entitled proceeding, in which relief is sought by (name of movant) from the automatic stay provided by 11 U.S.C. § 362, I do hereby certify to the best of my knowledge the following:

(1) Nature of Movant's Interest.

(2) Brief Description of Security Agreement, copy attached (if applicable).

(3) Description of Property Encumbered by Stay (include serial number, lot and block number, etc.).

(4) Basis for Relief (for cause, property not necessary for reorganization, debtor has no equity, property not property of estate, etc.) include applicable subsection of 11 U.S.C. § 362).

(5) Prior Adjudication by Other Courts, copy attached (Decree of Foreclosure, Order for Possession, Levy of Execution, etc., if applicable).

(6) Valuation of Property, copy of Valuation attached (Appraisal, Blue Book, etc.):

Fair Market Value: _____

Senior Liens : _____

Movant's Lien: _____

Other Liens: _____
(Listed in order of priority)

Net Equity: _____

Source/Basis of Value: _____

(7) Amount of Debtor's Estimated Equity (using figures from paragraph 6, supra).

(8) Month and Year in Which First Direct Post-petition Payment Came Due to Movant (if applicable).

(9)(a) **For Movant/Lienholder (if applicable): List or attach a list of all post-petition payments received directly from debtor(s), clearly showing date received, amount, and month and year for which each such payment was applied.**[1]

(b) **For Objecting Party (if applicable): List or attach a list of all post-petition payments included in the Movant's list from (a) above which objecting party disputes as having been made. Attach written proof of such payment(s) or a statement as to why such proof is not available at the time of filing this objection.**

(10) **Month and Year for Which Post-petition Account of Debtor(s) is Due as of the Date of this Motion:**

Date: _____

_____
Signature of Attorney/ *Pro Se* Debtor

_____
Typed Printed Name

_____
Address/Telephone/Facsimile/E-mail

_____
District Court I.D. Number

---

[1] This requirement may not be met by the attachment of a payment history generated by the movant. Such attachment may be utilized as a supplement to a complete and detailed response to (9)(a) above, which should be shown on this certification.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

IN RE:                                    )        Bankruptcy Case No: 18-02673/HB
                                          )        Chapter 7
Samuel Nimrod Smith                       )
 aka Sam N. Smith                         )
                                          )
                                          )
                    DEBTOR(S).            )
_____  )

## CERTIFICATE OF SERVICE

This is to certify that I, Sharal Bateman, of the Johnson Law Firm, P.A, am this day serving on the persons named below the Notice of Motion Seeking 11 U.S.C. Section 362 (D) Relief, Motion on Behalf of Specialized Loan Servicing LLC, to Modify Stay, Certification of Facts, and a Blank Certification of Facts in this matter by placing a copy of same this June 29, 2018, in the United States Mail, postage pre-paid, in envelopes addressed as follows:

Samuel Nimrod Smith
Pro-Se Debtor
100 Bermuda Run, Apt. F-7
Statesboro, GA 30458

John K. Fort (via ECF)
Chapter 7 Trustee
PO Box 789
Drayton, SC 29333

Sharal Bateman

June 29, 2018